<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| Staff4Jobs, LLC and Lyneer Staffing Solutions, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> List Logistics, LLC, <br><br> Defendant. | Civil Action No. 18-13399 (ZNQ) (LHG) <br><br> **OPINION** |

<u>**QURAISHI, District Judge**</u>

**Introduction**

This matter comes before the Court upon the Motion for Summary Judgment (the "Motion") filed by Plaintiffs Staff4Jobs, LLC ("Staff4Jobs") and Lyneer Staffing Solutions, LLC ("Lyneer") (collectively, "Plaintiffs"). Plaintiffs filed a Brief in Support of the Motion ("Moving Br.", ECF No. 57-2.) Defendant-Counterclaimant List Logistics, LLC ("Defendant" or "List") filed a Brief in Opposition. ("Opp'n.", ECF No. 59.) Plaintiffs filed a Reply Brief in Support of the Motion. ("Reply", ECF No. 60.) The Court has decided the Motion based on the written submissions of the parties and without oral argument, pursuant to Local Civil Rule 78.1(b). For the reasons stated herein, Plaintiffs' motion is GRANTED in part and DENIED in part.

**Background**

I.  **Factual Background**

This case arises from a failed business relationship between Plaintiffs and Defendant. Plaintiffs Staff4Jobs and Lyneer provide outsourced staffing services for employers. (Pls.'

1

Statement of Undisputed Material Facts ("SUMF") ¶ 2, ECF No. 57-1; Def.'s SUMF ¶ 2, ECF No. 59-10.)  Plaintiffs recruit, interview, and screen potential employees. (*Id*.)  They then hire the employees and assign them to work for their customers. (*Id*.)  Defendant List is a "warehousing and logistics provider with multiple facilities throughout the country." (Def.'s Counterstatement of Material Facts ("CSMF") ¶ 1, ECF No. 59-10.)

    A.   The Staffing Agreement

In early 2015, List negotiated a staffing contract with Staff4Jobs. (Pls.' SUMF ¶ 1.)  The substance of the negotiation is disputed.  List asserts that Staff4Jobs was "specifically advised of [List's] . . . requirement that all applicants be properly screened and that only individuals that were legally authorized to work in the United States and the state were permitted to work on [List's] accounts." (Def.'s CSMF ¶ 4.)  List further states that Staff4Jobs' sales representative "assured [List] in no uncertain terms, that Plaintiff employed state-of-the-art screening practices for all applicants including using the government's 'E-Verify' system to verify all applicants were legally authorized to work in the United States."[1] (*Id*. ¶ 6.)  Plaintiffs deny these discussions occurred. (Pls.' Responsive Facts ¶¶ 3, 4, 5, 6, ECF No. 60.)

The parties finalized their contract ("the Staffing Agreement") on March 30, 2015. (Pls.' SUMF ¶ 2.)  Under the Staffing Agreement, Staff4Jobs agreed to recruit, screen, interview, and hire employees.  Staff4Jobs would then assign those employees (the "Assigned Employees") to perform work for List. (Pls.' Ex. A ¶ 2, ECF No. 57-6.)  Staff4Jobs also agreed to pay the Assigned Employees' wages, provide limited benefits, and manage issues related to workers' compensation, payroll taxes, and unemployment insurance. (*Id*.)  In exchange, List agreed to

---

[1]  E-Verify is a program developed by the United States Department of Homeland Security. It is used to verify an employee's legal status and eligibility to work in the United States. (Def's. SUMF ¶ 9.)

2

make payments to Staff4Jobs. (*Id*. ¶ 4.) Payments were due forty-five days post invoice. (*Id*.) However, the Staffing Agreement allowed List to delay payment beyond that period at an interest rate of 1.5 percent each month. (*Id*.) Finally, the Staffing Agreement stated that the parties "represent that they are in compliance with all applicable laws which govern or may relate to each of the Parties' roles under the Staffing Agreement." (*Id*. ¶ 6.)

### B. *Performance Under the Staffing Agreement*

According to List, the parties' relationship grew strained when List discovered Staff4Jobs had assigned workers without legal work authorization to List's account. (Def's CSMF ¶¶ 12–15.) In late 2017, List tried to permanently hire an Assigned Employee but learned that she did not have authorization to work legally in the United States. (*Id*. ¶ 12.) Around the same time, a List employee avers that he discovered that multiple Assigned Employees lacked legal work authorization. (Hvozdovic Cert. ¶ 3, ECF No. 59-9.) These Assigned Employees, along with permanent List employees, were also caught falsifying timecards. (*Id*.) When confronted, the Assigned Employees allegedly told the List employee that they lacked legal work authorization and feared deportation. (*Id*.)

Plaintiffs respond that Staff4Jobs and Lyneer complied with all federal and state regulations in the screening process, engaged in I-9 compliance, and retained an immigration attorney to consult with their compliance department. (Pls.' Responsive Facts ¶ 8.) The individual who screened employees for Staff4Jobs testified that Staff4Jobs had access to E-Verify software. (Def.'s Ex. D at 78:5, ECF No. 59-2.) He also testified that Staff4Jobs used the screening requirements provided by its clients. (*Id*. at 79:10.) When asked if E-Verify was used for List's account, he responded: "I don't believe so, but I don't know." (*Id*. at 79:22)

3

List claims it lost revenue from two customers—Avrio Logistics ("Avrio") and Rema Foods ("Rema")—because Staff4Jobs assigned unauthorized workers to List's account. (*Id.* ¶ 15.) List asserts the Rema contracts were worth $1.6 million and the Avrio contracts represented $2.2 million in revenue. (*Id.*)  The parties deposed Avrio's President, Michael Mortorano ("Mortorano"), and Rema's Director of Supply Chain, Elliot Scheck ("Scheck"). (Pls.' SUMF ¶ 19–20.)

Mortorano, testified that three Avrio customers—Krauss, Ikeddi, and Spirit—expressed concerns that List, via Staff4Jobs, employed workers without legal work authorization. (Pls'. Ex. I at 12:2, ECF No. 57-14.)  Mortorano testified that Ikeddi's CFO visited a warehouse in Edison, New Jersey. (Mortorano Test. at 13:1–14:10, ECF No. 59-2.)  A warehouse employee allegedly told Ikeddi's CFO that a staffing agency assigned undocumented workers to the facility. (*Id.*) Mortorano testified that the Ikeddi CFO then called Mortorano and said, "I'm not giving you the business." (*Id.*)  Similarly, Mortorano states that a Spirit employee told him that due to "irregularities with the staffing," Avrio was "not going to get awarded any bids." (*Id.* at 20:11.) Mortorano advised List that he "had heard [List] had a problem" with unauthorized workers employed "through a staffing agency in New Jersey." (Def's CSMF ¶ 14.)  Staff4Jobs was the only staffing agency providing services to List in New Jersey at that time. (*Id.*)  Mortorano testified that Avrio would have continued to contract with List if Avrio obtained contracts from these customers. (Mortorano Test at 73:12.)  But Mortorano had no direct knowledge of any workers without legal work authorization assigned to any List account. (Pls.' Ex. I at 37:8.)

Rema's Director of Supply Chain, Scheck, testified that Rema terminated its contract with List because it had "a building that was big enough to handle all [its] inventory." (Pls.' Ex. H at 16:3–9, ECF No. 57-13.)  When asked if there was another reason why Rema terminated its

4

contract with List, Scheck replied "No." (*Id*.)  List's managing member, George Yfantopulos, testified that Scheck informed him the contract was not awarded to List because of the perception that List, via Staff4Jobs, employed undocumented workers. (Yfantopulos Test. at 119:1–10, ECF No. 59-2.)  Scheck testified at deposition that he was never informed about workers without legal work authorization working on Rema jobs. (Pls.' Ex. H at 20:2.)  Scheck also testified that he never spoke with Yfantopulos about the issue. (*Id*. at 20:10.)

      C.  *The Alleged Settlement*

In February 2018, Staff4Jobs' CFO, Jim Radvany, spoke with Yfantopulos regarding the parties' performance under the Staffing Agreement. (Def's CSMF ¶ 16; Pls.' Responsive Facts ¶ 16, ECF No. 60.)  At the time of the meeting, List had an unpaid balance with Staff4Jobs. (*Id*.)  The parties do not agree on the amount owed.  List claims that its outstanding balance was approximately $500,000 in February 2018. (Def's CSMF ¶ 16.)  Staff4Jobs presented invoices that show List owed Staff4Jobs $1,309,986.37 at that time—$920,696.06, plus interest for delayed payments. (Pls.' Ex. B at 3, ECF No. 57-7.)

List claims that the parties came to an agreement ("the Settlement Agreement") during the February 2018 conversation. (Def.'s CSMF ¶ 16.)  In an affidavit, Yfantopulos avers that the parties agreed to settle List's debt. (*Id*.)  In exchange, List supposedly agreed not to sue Staff4Jobs over its alleged failure to screen employees for valid work authorization. (*Id*.)  Yfantopulos claims Radvany wanted to avoid litigation because Radvany was in the process of selling Staff4Jobs. (*Id*.)  At his deposition, Yfantopulos stated that Radvany wanted to be assured that, going forward, List would stay current on its invoices from Staff4Jobs' acquiror. (Pls.' Ex. 1 at 37, ECF No. 60-4.)  Yfantopulos further testified that Radvany "told him not to pay the old stuff." (*Id*. at 37:7.)  Yfantopulos also testified that "the exchange was to make sure we stay

current and pay our bills [to the new company.] Not more than that. There's nothing more than that." (*Id*. at 40:18-40:23.)

Plaintiffs call Yfantopulos' account an "outright fabrication" and deny that Radvany agreed to release List from its debt to Staff4Jobs. (Pls.' Responsive Facts ¶ 16.) Radvany testified that he always insisted that List get on a payment plan and satisfy the entire balance owed to Staff4Jobs. (*Id*.) Radvany did recall an April 2018 call, in which Yfantopulos threatened to sue and involve the Department of Labor if Plaintiffs did not "walk away from the old balance." (Radvany Test. at 96:16, ECF No. 59-2.)

### D. *Subsequent Events*

On February 21, 2018, Plaintiff Lyneer acquired Staff4Jobs—including Staff4Jobs' customer contracts and customer lists. (Pls.' SUMF ¶ 12.; Def's CSMF ¶ 19.) Staff4Jobs did not invoice List regarding the pre-February balance after the February negotiations. (Def's CSMF ¶ 22.) After the acquisition, Lyneer provided staffing services for List. (*Id*. ¶ 20.) In June 2018, Yfantopulos emailed Lyneer and requested an accounting of "all the monies that are owed to the current company as of this morning." (Yfantopulos Cert. Ex. E at 44, ECF No. 59-4.) A Lyneer employee responded: "Please see your aging [sic] below. Total due $37,295.48." (*Id*.)

In June 2018, Yfantopulos requested that Radvany sign a document memorializing the alleged February Settlement Agreement. (Defs.' CSMF ¶ 23.) List needed this written release for banking purposes. (*Id*. ¶ 22.) Radvany refused to sign the release. (*Id.* ¶ 23.)

## II. Procedural Background

In July 2018, Plaintiffs sued Defendant List and George Yfantopulos in New Jersey Superior Court. (Notice of Removal at 6, ECF No. 1.) Defendants removed the case to this Court. (*Id*. at 1.) The Court denied Plaintiffs' motion for remand (ECF No. 13.), and granted Defendants' motion to dismiss the original complaint, (ECF No. 19.)

Plaintiffs filed an amended complaint. (*See* Am. Compl., ECF No. 20.) It alleges two counts of breach of contract and one count of quantum meruit against List.[2] (Am. Compl. ¶¶ 6–19.) In Count One, Staff4Jobs alleges that List failed to comply with the Staffing Agreement and owed $920,696.06, plus interest. (*Id.* ¶ 10.) In Count Two, Lyneer alleges breach of the Staffing Agreement because List failed to pay for $44,009.23 in services, plus interest. (*Id.* ¶ 16.) In Count Three, Lyneer sues List for quantum meruit regarding the same $44,009.23. (*Id.* ¶ 19.)

List answered and counterclaimed. (*See* Def.'s Counterclaim, ECF No. 26.) List's counterclaims include breach of contract, breach of the implied duty of good faith, fraud, and promissory estoppel. (Def.'s Counterclaim ¶¶ 20–37.) Specifically, List asserts that Plaintiffs failed to comply with the policies and procedures in place for screening, interviewing, and assigning employees. (*Id.* ¶¶ 4–15.) List maintains that Plaintiffs improperly hired workers without legal work authorization to provide services on List accounts in violation of the Staffing Agreement. (*Id.*) List further argues that Plaintiffs released any claims on List's pre-February 2018 balance in the alleged Settlement Agreement. (*Id.* ¶ 16.) Thus, List asserts that Plaintiffs' lawsuit was a breach of the alleged Settlement Agreement. (*Id.* ¶¶ 19, 25–29.)

Plaintiffs answered List's counterclaim but failed to put forth any affirmative defenses. (*See* ECF No. 27.) The parties then engaged in discovery. In March 2021, Plaintiffs filed the present Motion for Summary Judgment. (ECF No. 57.)

After the parties fully briefed this motion, Plaintiffs moved to amend their answer to Defendant's counterclaims to add the Statute of Frauds as an affirmative defense. (ECF No. 62.) Because Plaintiffs moved to amend at such a late stage, the Court denied their motion to amend. (ECF No. 68.)

---

[2] George Yfantopulos was omitted from the Amended Complaint. (*See* ECF No. 20.)

## Legal Standard

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* When deciding the existence of a genuine dispute of material fact, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The Court must grant summary judgment if any party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "[I]nferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983).

## Discussion

Plaintiffs move for summary judgment on both their own breach of contract claims and Defendant's counterclaims. Defendant opposes. For the reasons stated herein, the Court grants summary judgment in favor of Plaintiffs on: Plaintiffs' Count Two (Lyneer's Breach of Contract Claim); Defendant's Counterclaim One (Breach of Contract); and Defendant's Counterclaim Three (Fraud).

The Court denies Plaintiffs' motion for summary judgment on Plaintiffs' Count One (Staff4Jobs' Breach of Contract Claim); Defendant's Counterclaim Two (Breach of the Settlement Agreement); and Defendant's Counterclaim Four (Promissory Estoppel).

### III.    Plaintiffs' Claims

Staff4Jobs and Lyneer each move for summary judgment on their respective breach of contract claims. For the reasons set forth below, the Court will deny summary judgment on Staff4Jobs' breach of contract claim (Count One) and grant summary judgment on Lyneer's breach of contract claim (Count Two).

### A.    Staff4Jobs' Breach of Contract Claim

In Count One, Staff4Jobs alleges that List breached the Staffing Agreement when List failed to pay Staff4Jobs for services rendered under the contract. A breach of contract claim requires (1) a contract; (2) a breach of that contract; (3) that the party stating the claim performed its own contractual obligations; and (4) damages flowing from the breach. *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007). First, the parties do not dispute that a contract—the Staffing Agreement—existed. Second, it is undisputed that List has not paid Staff4Jobs for some of the services rendered. Third, Plaintiffs contend they complied with all contractual obligations. Thus, Plaintiffs argue there is no excuse for List's failure to pay. Finally, Staff4Jobs claims it suffered damages of $1,309,986.37—$920,696.06 for services rendered, plus interest for delayed payments. (Pls.' Ex. B at 3, ECF No. 57-7.)

Defendant List opposes summary judgment for three reasons. First, List claims that the parties reached a Settlement Agreement in February 2018 that released List from its obligation to pay pre-February 2018 debts. Second, List claims its non-payment is excused because Staff4Jobs materially breached its own contractual obligation to screen workers for valid work authorization. Third, List disputes the outstanding balance amount as of February 2018.

9

A substitute contract is an exchange of promises which extinguishes an underlying obligation. *Michael J. Benenson Associates, Inc. v. Orthopedic Network of New Jersey*, 54 Fed. Appx. 33, 36 (3d Cir. 2002). Whether a substitute contract exists is a question for the jury. *Id*. at 36–37 (citing *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 147–48 (3d Cir. 1999)). Moreover, New Jersey courts repeatedly "caution against the use of summary judgment to decide a case that turns on the intent and credibility of the parties." *McBarron v. Kipling Woods L.L.C.*, 838 A.2d 490, 492 (N.J. Super. App. Div. 2004) (collecting cases).

Here, the record provides conflicting evidence regarding the terms of the alleged Settlement Agreement. According to the Yfantopulos affidavit, Staff4Jobs promised to forgive List's outstanding balance. In exchange, Yfantopulos states that List agreed to continue its business relationship with Staff4Jobs' acquirer, Lyneer, and promised to "stay current" on its bills going forward. Yfantopulos also claims that he agreed not to sue Staff4Jobs over the employment of workers without legal work authorization. At his deposition, however, Yfantopulos made no mention of this promise not to sue. Plaintiffs' counsel asked: "[Did Radvany] say we want something in exchange for relinquishing the old debt?" (Pls.' Ex. 1 at 40:15, ECF No. 60-4.) Yfantopulos responded "[T]he exchange was to make sure we stay current and pay our bills [to Lyneer]. Not more than that. There's nothing more than that." (*Id*. at 40:20.)

Radvany did recall an April 2018 call, in which Yftantopulos threatened to sue and involve the Department of Labor if Plaintiffs did not "walk away from the old balance." (Radvany Test. at 96, ECF No. 59-2.) Radvany testified, however, that he insisted Defendant get on a payment plan and satisfy the entire balance owed to Staff4Jobs. (Pls.' Responsive Facts ¶ 16.) On the other hand, Radvany could not identify any invoices or written communication

sent to List regarding the pre-February balance between February 2018 and the filing of this lawsuit in July 2018. (Radvany Test. at 85:6, ECF No. 59-2.)

Viewing the issues of credibility in favor of the non-moving party, *Meyer*, 720 F.2d at 307, the Court finds that there is a genuine dispute as to the existence of the alleged Settlement Agreement. Specifically, a reasonable jury could find that a Settlement Agreement existed based on Yfantopulos' statements, Radvany's testimony, and the fact that Staff4Jobs did not formally pursue the pre-February debt until July 2018. If the parties did reach an accord, List may not be liable for the pre-February debt. Thus, the existence of the Settlement Agreement is a disputed fact that is material to the outcome of the case.

Plaintiffs' legal arguments to the contrary are unavailing.[3] First, Plaintiffs argue that the alleged Settlement Agreement was not a valid contract because List offered no consideration in exchange for debt forgiveness. "Basic contract principles render a promise enforceable against the promisor if the promisee gave some consideration for the promise." *Martindale v. Sandvik*, 173 N.J. 76, 87 (2002). However, a promise to perform a preexisting legal duty cannot serve as consideration. *Segal v. Lynch*, 211 N.J. 230, 253 (2012) (citing *Williston on Contracts* § 7:37 (4th ed. 2008)). Plaintiffs believe summary judgment is warranted because Yfantopulos testified that "the exchange was to make sure we stay current and pay our bills [to Lyneer]. Not more than that. There's nothing more than that." (Pls.' Ex. 1. at 40:20.) Plaintiffs assert that List's

---

[3] Plaintiffs failed to include any affirmative defenses in their answer to Defendant List's counterclaims. The failure to plead an affirmative defense to a counterclaim can result in waiver of that defense as to the counterclaim. *See* Wright & Miller, *Federal Practice and Procedure* § 1347 (3d ed.). However, Plaintiffs' failure to include the affirmative defenses in an answer to the counterclaim does not preclude the use of those same arguments to support the causes of action in Plaintiffs' original complaint. Thus, because Plaintiffs properly raised the statute of frauds and the failure of consideration in their reply brief, the Court may consider those arguments here.

promise to "stay current" going forward was a preexisting duty under the Staffing Agreement. (*Id*.) Thus, Plaintiffs believe that promise could not serve as consideration for debt forgiveness.

While it may be a close issue, List's forward-looking promise to "stay current" was not a preexisting duty under the Staffing Agreement. *See* 2 *Corbin on Contracts* § 7.1 (2021) (cautioning courts that the preexisting duty rule should never be used as a "major premise" of a decision without careful consideration). This is not a case where an architect stops performance halfway through construction and demands a greater fee to continue the same job. *Restatement (Second) of Contracts* § 73 (1981). Rather, List allegedly agreed to pay for future services in a timely manner. (Pls.' Ex. 1. at 40:20.) That forward-looking promise to pay on-time suffices as consideration because, under the Staffing Agreement, List had the power to pay belatedly and incur interest. (Pls.' Ex. A ¶ 4.) Therefore, even if the Court sets aside Yfantopsulos' conflicting testimony about his promise not to sue Staff4Jobs, a reasonable jury could find that List offered some consideration—giving up its contractual right to pay belatedly and incur interest—in exchange for the debt forgiveness.

Second, Plaintiffs argue that the New Jersey Statute of Frauds applies to the alleged Settlement Agreement. *See* N.J.S.A. 25:1-5. It does not. Plaintiffs cite N.J.S.A. 25:1-5(f) and (g), which require loan modifications to be in writing when "made by a person engaged in the business of lending or arranging for the lending of money or extending credit." N.J.S.A. 25:1-5(f). Plaintiffs claim that this provision applies to businesses that extend credit to customers. The statute's reach is not that broad. While Plaintiffs may have been permitting its customers to carry a balance, they were not "in the business of lending money." *Id*. They are in the business of providing staffing services. Thus, the Statute of Frauds does not apply here.

Finally, Plaintiffs argue that the Staffing Agreement had a clause barring oral modifications. But a "no oral modification" clause may be waived by the parties by entering into an otherwise enforceable oral agreement. *See China Falcon Flying Ltd. v. Dassault Falcon Jet Corp.*, 329 F. Supp. 3d 56 (D.N.J. 2018); *McGrath v. Poppleton*, 550 F. Supp. 2d 564, 571 (D.N.J. 2008). *See generally*, *Williston on Contracts* § 29:42 ("At common law, an oral agreement is sufficient to modify or rescind a written contract, notwithstanding a provision in the written contract purporting to require that subsequent modifications be evinced by a writing."). Thus, Plaintiffs' reliance on this no oral-modification clause fails.

In sum, Plaintiffs' motion for summary judgment on Plaintiffs' Count One is denied because there is a genuine dispute of material fact as to whether the parties reached a valid Settlement Agreement.

### B. Lyneer's Breach of Contract Claim

Lyneer claims that List breached the Staffing Agreement's payment terms when it failed to pay for staffing services provided after February 2018. The parties agree that Lyneer acquired Staff4Jobs—including Staff4Jobs' customer contracts and customer lists—in February 2018. (Pls.' SUMF ¶ 12.; Def's CSMF ¶ 19.) The parties also agree that List promised to pay Lyneer for staffing services provided after February 2018. (Def.'s CSMF ¶ 15.) Finally, it is undisputed that List failed to pay Lyneer for those services. (*Id.*)

Thus, the only question is how much money List owes to Lyneer. Lyneer seeks $44,009.23 plus $16,195.63 in interest for List's delayed payments. (Pls.' Ex. B at 4, ECF No. 57-7.) List admits it "agreed to pay the amount of $44,009.23, which is due to Lyneer." (Def.'s CSMF ¶ 15.) However, List contests that Lyneer is not entitled to any interest because there was no written contract between List and Lyneer. (*Id.* ¶ 13.)

The Court finds that Lyneer is entitled to both the $44,009.23 and the $16,195.63 in interest. The Staffing Agreement provides that List agreed to pay for staffing services within forty-five days of invoice. (Pls.' Ex. A ¶ 4.) List further agreed to pay a "finance charge of 1.5% per month on all past-due balances." (*Id*.) The Staffing Agreement allowed Staff4Jobs to transfer the contract to Lyneer. (*Id*. ¶ 11.) Therefore, List was obligated to abide by the payment terms in the Staffing Agreement during its course of dealing with Lyneer after February 2018. That List also broke its alleged promise to "stay current" going forward does not excuse List from its payment obligations under the Staffing Agreement. Thus, Lyneer is entitled to the interest payments, as detailed in the invoices provided. (*See* Pls.' Ex. A ¶ 4, ECF No. 57-6.)

In sum, Lyneer's motion for summary judgment on its breach of contract claim is granted. Judgment will be entered in favor of Plaintiff, Lyneer Staffing Solutions, LLC, and against Defendant, List Logistics, LLC, in the amount of $60,204.86.

## IV. Defendant's Counterclaims

Defendant asserts four counterclaims—breach of the Staffing Agreement, fraud, breach of the Settlement Agreement, and promissory estoppel. Defendant claims damages of (1) lost revenue due to Plaintiffs' failure to screen employees and (2) the costs of defending this lawsuit. Plaintiffs move for summary judgment on each counterclaim.

### A. Breach of the Staffing Agreement

Defendant's breach of contract claim requires proof of (1) a contract; (2) a breach of that contract; (3) that the party stating the claim performed its own contractual obligations; and (4) damages flowing from the breach. *Frederico*, 507 F.3d at 203. Plaintiffs contest both the breach element and the damages element. First, Plaintiffs argue that Defendant has not provided any evidence that Plaintiffs failed to screen employees as required under the Staffing Agreement. (Moving Br. at 8.) Second, Plaintiffs argue Defendant has not submitted evidence that workers

14

without legal work authorization were staffed to its account. (*Id.*)  Third, Plaintiffs argue Defendant has not produced any admissible evidence to prove damages.  (*Id.* at 13.)

The Court agrees that Defendant has not produced admissible evidence to support its breach of contract claim.  Specifically, Defendant claims that it lost business from two accounts—Rema and Avrio—because of Plaintiffs' breach.  Each claim is unsupported. Rema's Director of Supply Chain—Elliot Scheck—disavowed Defendant's theory.  Scheck testified during his deposition that Rema terminated its contract with List because it had "a building that was big enough to handle all [it's] inventory." (Pls.' Ex. H at 16:3–9, ECF No. 57-13.)  When asked if there was another reason why Rema terminated its contract with List, Scheck replied "No." (*Id.*)  Scheck stated that he was never informed about undocumented workers working on Rema Jobs. (*Id.* at 20:2.)  Scheck also testified that he never had a conversation with Yfantopulos regarding undocumented workers on List accounts. (*Id.* at 20:10.)

Likewise, the testimony of Avrio's President—Michael Mortorano—cannot support List's breach of contract claim.  Yfantopulos and Mortorano claim that List lost business because its customer, Avrio, lost business from three clients—Ikeddi, Spirit, and Kraus.  Mortorano stated Ikeddi, Spirit, and Kraus informed him that they could not award contracts to Avrio because List—via Staff4Jobs—employed undocumented workers. (Mortorano Test. at 13:1–14:10, ECF No. 59-2.)  Critically, Mortorano did not have any personal knowledge of any worker without proper legal work authorization. (Pls.' Ex. I at 37:8.)  Rather, Mortorano testified that an employee told a client about unauthorized employees working for List. That client, in turn, told Mortorano. (Mortorano Test. at 13:1–14:10.)

Under the Federal Rules of Evidence, out-of-court statements offered for the truth of the matter asserted are considered hearsay. *See* F.R.E. 801.  Here, List offers Mortorano's testimony

15


about his clients' out-of-court statements to prove (1) that Staff4Jobs staffed undocumented workers on List accounts; and (2) that List suffered damages as a result. Thus, the testimony is hearsay. In the case of Mortorano's testimony about his conversation with a client about his client's conversation with a warehouse worker, the testimony is double hearsay. Hearsay is not admissible at trial unless any of the following provides otherwise: a federal statute; a hearsay exception under the Federal Rules of Evidence; or other rules prescribed by the Supreme Court. F.R.E. 802. On summary judgment, district courts may consider hearsay as follows:

> The rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial. In ruling on a motion for summary judgment, the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial. The proponent need only 'explain the admissible form that is anticipated.'" Thus, in ruling on Defendants' motion for summary judgment, the district court should have limited its inquiry to determining if the out-of-court statements Plaintiffs were relying on were admissible at trial.

*Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238–39 (3d Cir. 2016). Here, Defendant has not explained any theory—or exception to the hearsay rule—under which Mortorano's testimony could be admissible. Thus, the Court cannot consider Mortorano's inadmissible statements on summary judgment. *E.g., Conard v. Pennsylvania State Police*, No. 20-3644, 2022 WL 58543, at *3 (3d Cir. Jan. 6, 2022).

The Court must grant summary judgment if any party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Thus, Defendant has not provided admissible evidence of lost business due to the alleged breach. Therefore, Defendant has failed to make a showing sufficient to establish the existence of an essential element of its claim. As a result, the Court grants summary judgment in favor of Plaintiffs on this counterclaim.

B.  *Fraud*

Next, Plaintiffs move for summary judgment on List's fraud counterclaim. A party asserting a claim of common-law fraud must establish: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereupon by the other person; and (5) resulting damages." *Triffin v. Automatic Data Processing, Inc.*, 926 A.2d 362, 368 (N.J. App. Div. 2007) (citing *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997)). "Fraud is not presumed; it must be proven through clear and convincing evidence." *Stochastic Decisions, Inc. v. DiDomenico*, 565 A.2d 1133 (N.J. App. Div. 1989).

Some evidence exists to support the first four elements of List's fraud counterclaim. List's former President averred that Staff4Jobs made material misrepresentations about the use of E-Verify software to induce List to contract with Staff4Jobs for staffing services. (Schindler Cert. ¶ 8., ECF No. 59-8.) Specifically, List points to statements made regarding E-Verify during contract negotiations and throughout the parties' relationship. (Def.'s CSMF ¶ 8.) The person who screened employees for Staff4Jobs, however, testified that did not know if E-Verify was ever used to screen the Assigned Employees on List's account. (Def.'s Ex. D at 79:22, ECF No. 59-2.) Given that Staff4Jobs did have access to E-Verify, a jury could find that List's reliance on Plaintiffs' alleged representations was reasonable. (*Id.*)

However, List provides no admissible evidence of the fifth element, damages. First, the Scheck deposition specifically refuted the theory that List lost Rema's business because of Staff4Jobs' screening failures. (Pls.' Ex. H at 16:3–9.) Second, as discussed above, the claim that List lost business from Avrio because of Staff4Jobs' screening failures is unsubstantiated in the admissible record. *See* Part II.A *supra*.

Third, List claims it suffered damages because certain Assigned Employees—who allegedly did not have proper work authorization—falsified timecards while working at List. (Opp'n. at 18, ECF No. 59.) This argument fails as a matter of law. Staff4Jobs' misrepresentations were not a proximate cause of the alleged theft. *See Caspersen as Tr. for Samuel M.W. Caspersen Dynasty Tr. v. Oring*, 441 F. Supp. 3d 23, 40 (D.N.J. 2020) ("A plaintiff alleging deceit must establish that he or she relied on a defendant's misrepresentation and that those misrepresentations were a proximate cause of the damage.") Here, List provides no evidence of any causal relationship between the Assigned Employees' lack of legal work authorization and their theft—other than the unstated inference that but-for knowledge of their immigration status, List would not have accepted the employees. (Hvozdovic Cert. ¶ 3.) Indeed, List admits that both Assigned Employees and List's permanent employees engaged in this alleged scheme. (*Id.*) That fact undermines any causal link between Staff4Jobs' representations about its screening practices and the theft. Finally, List provides no evidence as to the amount of damages it suffered due to this alleged theft.

Thus, Plaintiffs are entitled to summary judgment on List's fraud counterclaim because List has failed to make a showing that Plaintiffs' alleged misrepresentations proximately caused any damages.

### C. Breach of the Settlement Agreement & Promissory Estoppel

As discussed above, there are disputed questions of material fact as to whether the parties came to a Settlement Agreement in February 2018. *See* Part I.A.1 *supra*. Therefore, the Court will deny Plaintiffs' motion for summary judgment on Defendant's counterclaims for Breach of the Settlement Agreement and Promissory Estoppel because both claims rely on material disputed facts regarding that negotiation.

**Conclusion**

For the foregoing reasons, the Court grants summary judgment in favor of Plaintiffs on: Plaintiffs' Count Two (Breach of Contract); Defendant's Counterclaim One (Breach of Contract); Defendant's Counterclaim Three (Fraud). As a result, judgment will be entered in favor of Plaintiff Lyneer Staffing Solutions, LLC, and against Defendant, List Logistics, LLC, in the amount of $60,204.86.

The Court denies Plaintiffs' motion for summary judgment on Plaintiffs' Count One (Breach of Contract); Defendant's Counterclaim Two (Breach of the Settlement Agreement); and Defendant's Counterclaim Four (Promissory Estoppel). An appropriate order follows.

Date: February 25, 2022

  s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**